IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 6, 2019 Session

## THE ELECTRIC EMPLOYEES' CIVIL SERVICE AND PENSION BOARD OF METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE v. BRIAN MANSELL

**Appeal from the Chancery Court for Davidson County**
No. 18-0671-II      Russell T. Perkins, Chancellor

———————————————————

**No. M2019-00413-COA-R3-CV**

———————————————————

This appeal arises from the decision of the Metropolitan Government of Nashville and Davidson County Electric Power Board to terminate a Nashville Electric Service ("NES") cable splicer/working foreman. The foreman allegedly approved fraudulent timesheets for a Metropolitan Nashville Police Department officer, who performed traffic control at NES jobsites for a private contractor. After NES preferred charges against the foreman and suspended him without pay, the board referred the matter to an administrative law judge ("the ALJ") for adjudication. Following a two-day administrative hearing, the ALJ made numerous findings of fact and conclusions of law in a 55-page report. The ALJ found that the foreman's job description did not include verifying the accuracy of the timesheets, NES had not trained the foreman on how to verify the accuracy of the timesheets, and a majority of the inaccurate timesheets could be explained by NES's common practice of rounding up hours at the end of an officer's shift. Although there was evidence that the officer overstated his hours, the ALJ found the evidence was insufficient to establish the foreman knowingly approved any false timesheets. Accordingly, the ALJ recommended that the charges of termination be denied and that the foreman be reinstated without back pay. After reviewing the ALJ's report, the board rejected his recommendation and approved NES's termination of the foreman. However, the board did not make its own findings of fact or express disagreement with the ALJ's findings. After the foreman filed his petition for judicial review, the trial court reviewed the administrative record and heard arguments of counsel. In its final order, the trial court concluded that "NES's lack of proof and the apparent acceptance of time-approval practices combine here to demonstrate a lack of substantial and material evidence to uphold the Board's decision to terminate." Thus, the trial court reversed the board's decision, adopted the ALJ's Report *in toto*, and directed that the foreman "be reinstated, without backpay." On appeal, the board contends the trial court applied incorrect principles of law and reweighed the evidence. We disagree. The Charter of the Metropolitan Government of Nashville and Davidson County requires the Electric Power

Board to reduce its findings to writing when taking disciplinary action against an employee. In this case, the board rejected the recommendation of the ALJ without making alternative findings of fact to support or explain its reasoning. Thus, the only findings of fact, credibility determinations, and conclusions of law in the administrative record are those of the ALJ. Because the ALJ's findings are supported by substantial and material evidence, we conclude that NES failed to prove by a preponderance of the evidence that the foreman knowingly approved false timesheets for the police officer. We also conclude that a reasoning mind could not have reached the same conclusion as the board under a proper application of the controlling legal principles. Accordingly, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which RICHARD H. DINKINS and CARMA DENNIS MCGEE, JJ., joined.

Robert W. Horton, Mary Leigh Pirtle, and Laura Israel Smith, Nashville, Tennessee, for the appellant, Electric Employees' Civil Service and Pension Board.

Michelle Blaylock Owens, Nashville, Tennessee, for the appellee, Brian Mansell.

## OPINION

### I.  BACKGROUND

NES provides electrical power to customers in downtown Nashville through an underground electrical infrastructure that NES maintains. At all times relevant to this appeal, the Metropolitan Government of Nashville & Davidson County ("Metro") required NES to have a uniformed Metropolitan Nashville Police Department ("MNPD") officer at each downtown worksite for traffic control to ensure the safety of the NES workers and the public. To comply with this mandate, NES contracted with a private business, FlagPros, which provided officers as and when requested by NES.

To document his or her service, each officer would prepare and submit a timesheet to the worksite's crew foreman before the end of the officer's shift. The timesheet was then submitted to an underground supervisor. NES provided the timesheets, each of which had only one signature line for approval. Although the title "NES Supervisor" was printed below the signature line, the crew foreman was expected to sign the timesheet before passing it to the underground supervisor. In turn, the supervisor indicated his approval by initialing the timesheet. Thereafter, the timesheet was submitted to NES accounting. Further, NES maintained the timesheets for verification purposes. FlagPros kept track of the officer's time separately and invoiced NES for its officers' services.

From 2012 to 2016, Brian Mansell, a cable splicer working foreman for NES, worked as the crew foreman for one of five NES "Network" crews that worked in downtown Nashville under the Construction and Maintenance ("C&M") section of NES. Mr. Mansell reported to the underground supervisor, Chuck Reinitz. Mr. Reinitz, in turn, reported to a group superintendent, who reported directly to the C&M operations manager. The C&M section had two operations managers during the relevant period. Ty Jones served in that position until October 2015, at which time Eric Lewis became the operations manager.

In 2015, Mr. Jones investigated allegations that FlagPros' officers were being compensated for services they did not provide, including allegations that Mr. Mansell knowingly signed false timesheets submitted by MNPD Officer Michael Moultry. In August of that year, Mr. Mansell admitted he approved timesheets for two days when Officer Moultry was on vacation, June 18 and 19, 2015, and a timesheet for June 12, 2015, which showed Officer Moultry worked a full day when he worked only a half-day. Based on these facts, NES promptly suspended Mr. Mansell without pay for five days.

Meanwhile, MNPD learned of the allegations that Officer Moultry and others submitted false timesheets to NES. MNPD conducted an investigation and compared the officers' NES timesheets with MNPD payroll records. By the end of the investigation, MNPD found over 200 NES timesheets that included hours for which both MNPD and NES had paid the officers. Upon being confronted with this information, Officer Moultry resigned, and four other police officers were fired.

In November of 2016, MNPD provided NES with a spreadsheet that summarized the hours reported by the officers to each employer. Eric Lewis, the new C&M operations manager, determined that 10 employees were responsible for approving the overlapping NES timesheets, including Mr. Mansell and Supervisor Reinitz. Mr. Lewis found that Mr. Mansell approved over 90 timesheets for Officer Moultry, nearly all of which were initialed by Supervisor Reinitz. Additionally, Supervisor Reinitz independently signed another 15 timesheets for Officer Moultry.

Except for Officer Moultry's June 12, 18 and 19, 2015 timesheets, for which Mr. Mansell had already been disciplined, Mr. Mansell denied that he knowingly approved any false timesheets. Nevertheless, Mr. Lewis sent a letter to the Electric Power Board ("the Board") in February 2017, recommending termination charges against Mr. Mansell for violation of NES Policy 67 and NES Rule 6.05 by "knowingly submitting inaccurate timesheets." Following a due process hearing, Mr. Mansell was suspended pending resolution of the matter.

Mr. Lewis also recommended a 10-day suspension for Mr. Reinitz, but the charges were dismissed at Mr. Reinitz's due process hearing.

- 3 -

## II.   THE CONTESTED CASE HEARING AND RECOMMENDATION

Mr. Mansell's contested case was assigned to administrative law judge Clark Spoden ("the ALJ") to conduct a contested case hearing. Mr. Mansell opposed termination because he denied knowingly submitting any false timesheets before June 12, 2015; he had already been punished for knowingly approving false timesheets submitted by Officer Moultry for June 12, 18, and 19, 2015; and there were no charges for timesheets submitted after June 19, 2015.

Following a two-day evidentiary hearing in August 2017, the ALJ issued a 55-page report with his findings and recommendation. The ALJ found the majority of the allegedly fraudulent timesheets were immaterial because, based on the testimony of current and former crew foremen and underground supervisors, it was common practice to pay officers through the end of the workday even if the NES crew left a jobsite early. More significantly, the ALJ found that the testimony of Hayes Baker, one of NES's key witnesses, was not believable. Mr. Baker's testimony was the only direct evidence that Mr. Mansell knew the remaining timesheets were not accurate.

Although NES asserted that it was Mr. Mansell's duty to verify the accuracy of the timesheets at issue before approving them, the ALJ found the evidence on this point was equivocal at best. The letter preferring charges against Mr. Mansell stated that the crew foreman *and* the supervisor had a responsibility to verify the accuracy of the officers' timesheets. Further, the timesheets had only one signature line for an "NES Supervisor." Nevertheless, it was undisputed that Mr. Mansell was instructed to sign the timesheet. The only other instruction given to Mr. Mansell was to add a work-order number.

Additionally, the ALJ found that Mr. Mansell's job description did not include overseeing the work of the police officers or verifying the accuracy of the officers' timesheets. Mr. Mansell's job description as an NES "Cable Splicer Working Foreman" stated that his primary duties were to oversee and coordinate "the work of employees to accomplish assigned tasks," to provide "input in the evaluation of employees and train employees as required," and to oversee "the work of *others* in accomplishing these tasks." (Emphasis added). The ALJ found it material that NES defined "others" as NES employees, and it was undisputed that the police officers provided by FlagPros were not NES employees.

The ALJ also found significant the lack of instructions provided to Mr. Mansell:

No written or oral instructions were given to Mr. Mansell with regard to his alleged duty to verify FlagPros' officers' timesheets. He was never told that it was his duty to verify the time on the FlagPro's timesheets or

- 4 -

the import of his signature on the timesheets. The only instruction given to Mr. Mansell regarding the FlagPros' timesheets was to insert the work order number on the document.

Thus, not only was assuring the accuracy of Officer Moultry's time not within Mr. Mansell's job description, Mr. Mansell was never given instructions on how to accomplish the task properly. Accordingly, the ALJ concluded that NES had no reasonable expectation that its crew foremen would monitor or verify the accuracy of the officers' timesheets.

Based on the foregoing and other findings in his 55-page report, the ALJ concluded that NES failed to prove Mr. Mansell engaged in misconduct that warranted termination and recommended that Mr. Mansell be reinstated but without back pay.

### III.    THE POWER BOARD'S DECISION

NES management appealed the ALJ's recommendation to the Board. Each party presented arguments to the Board at a hearing in March 2018, after which the matter was deferred for one month. During its April 2018 meeting, the Board voted 4 to 1 to reject the ALJ's recommendation and to terminate Mr. Mansell's employment. Although the Board's review of the case was limited to the evidence introduced during the contested case hearing, it rejected the ALJ's recommendation without making or adopting its own specific findings of fact to identify the factual basis for its decision. The only basis identified and approved by a formal vote of the Board was to approve the management's decision to terminate Mr. Mansell:

> Upon motion by Member Schott and seconded by Vice Chairman Campbell, the motion passed 4 to 1 to overturn the ALJ's decision and to uphold the decision of Management to terminate Mr. Mansell. Member Paz-Bernstein did not vote in favor of the motion.

Although the foregoing is the only official action the Board took concerning Mr. Mansell, the minutes from the Board's April 2018 meeting reveal that two Board members expressed concerns about employee honesty, NES employee "culture," and the "integrity of this institution." Board member Clinton Gray noted that Mr. Mansell "admittedly lied about something" and expressed concern that reinstating him would set the wrong example. Following a few questions to counsel, Ms. Schott motioned to reject the ALJ's recommendation:

> I've heard—I've read much of the record and briefs. We have had a lot of questions and discussions about culture. Statements have been made about the culture at NES and the culture of employees in the positions that we've been discussing, the culture at the police department and references have

been made to decisions with respect to NES employees, [m]anagement decisions, decisions made by the police department.

My view in making this motion in the way I am is that I'm looking at this particular instance with Mr. Mansell and there's no organization, whether it's NES, the police department, the civil service employees, financial institutions, law firms that wants a discussion about culture and integrity and honesty to be occurring with respect to that organization, and so my motion to reject the ALJ's decision is based particularly on evidence and arguments I reviewed with respect to Mr. Mansell.

Board member Robert Campbell seconded the motion, explaining his reasoning as follows:

[I]t's a very close call, . . . I think the integrity of the institution is critical. I think saying what we stand for is critical. I am convinced by the preponderance of the evidence that Mr. Mansell knew he was doing something wrong and did it intentionally. And while there may be some cultural things that were going on in terms of some of these .5s and covering, rounding up and down—which I see. I think there were things beyond that; his conduct beyond that was intentional. By reports and by his supervisor reports and everything else, he's been a great employee and I hate that it's come to this. But I think in weighing everything in a balance, we do have to stand—stand behind the fundamental premise of integrity and honesty in the organization. I am, frankly, a little bit more concerned that we didn't have more severe discipline for others who did, you know, that—that were not playing by the rules, but I'm somewhat convinced that a lot of those were much more gray in terms of sort of a cultural kind of rounding up sort of a concept where I think it's not so much the case for Mr. Mansell.

In June 2018, Mr. Mansell appealed the Board's decision by filing a Petition for Judicial Review with the Davidson County Chancery Court. After reviewing the administrative record and hearing arguments from both parties, the trial court entered its final order on January 31, 2019. Noting there were no written findings by the Board, the trial court adopted the ALJ's findings of fact *in toto* and concurred with the ALJ's conclusion that the evidence was insufficient to establish that Mr. Mansell knowingly violated any NES policy. Accordingly, the trial court reversed the Board's decision to terminate Mr. Mansell and ordered his reinstatement without back pay. This appeal followed.

- 6 -

## STANDARD OF REVIEW

This court reviews employment decisions by civil service boards "in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322." Tenn. Code Ann. § 27-9-114(b)(1); *see also City of Memphis v. Civil Serv. Comm'n of Memphis*, 238 S.W.3d 238, 242 (Tenn. Ct. App. 2007). Judicial review of such decisions is confined to the administrative record, and the board's findings are entitled to considerable deference. *See Metro. Gov't of Nashville & Davidson Cty. v. Shacklett*, 554 S.W.2d 601, 604 (Tenn. 1977). "However, an agency should expect closer judicial scrutiny of its findings of fact when the agency disagrees with a hearing officer's or administrative judge's findings of fact." *McEwen v. Tennessee Dep't of Safety*, 173 S.W.3d 815, 823 (Tenn. Ct. App. 2005). "While the courts will not abandon the substantial and material evidence standard of review, they may view the evidence supporting the agency's findings of fact as less substantial than it would otherwise be had the agency and the hearing officer or administrative judge reached the same conclusion." *Id*. (citations omitted).

Under Tenn. Code Ann. § 4-5-322, a court may reverse or modify a board's ruling if its findings, inferences, conclusions, or decisions are:

(1)     In violation of constitutional or statutory provisions;

(2)     In excess of the statutory authority of the agency;

(3)     Made upon unlawful procedure;

(4)     Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

*Id*. § 322(h).

This appeal arises from the trial court's order; nevertheless, we review the Board's decision relative to the administrative record and not the trial court's order. *See* Tenn. Code Ann. § 4-5-322(h).

## ANALYSIS

The determinative issues in this appeal are: (1) whether the Board was required to reduce to writing the findings of fact and conclusions of law upon which it relied to suspend, dismiss, or otherwise punish Mr. Mansell; (2) whether the findings of fact are supported by substantial and material evidence; and (3) "whether a reasoning mind could

reasonably have reached the conclusion reached by the [Board], consistent with a proper application of the controlling legal principles." *See McEwen*, 173 S.W.3d at 820.

## I. FINDINGS OF FACT ARE REQUIRED BY THE METRO CHARTER

Mr. Mansell argues that the Board's failure to issue a written order violates the contested case procedures under the Uniform Administrative Procedure Act ("UAPA"), Tenn. Code Ann. §§ 4-5-301 to -325, which require agencies to render a final order with "conclusions of law, the policy reasons therefor, and findings of fact for all aspects of the order, including the remedy prescribed," *id*. § 314. The Board contends that it is exempt from the UAPA's contested case procedures under Tenn. Code Ann. § 27-9-114(a)(2), which provides that the UAPA's contested case procedures "shall not apply to municipal utilities boards." While we agree that § 27-9-114 exempts the Board from the UAPA's contested case procedures, we have determined that the Charter of the Metropolitan Government of Nashville and Davidson County ("the Metro Charter") requires the Board to reduce its findings to writing when taking disciplinary action.[1]

### A. Contested Case Procedures under the UAPA

Under the UAPA's contested case procedures, ALJs have decision-making authority, including the authority to issue an "initial order," Tenn. Code Ann. § 4-5-314(b), which may become the final order by operation of law without being reviewed and approved by the agency, *see McEwen*, 173 S.W.3d at 821 (citing Tenn. Code Ann. § 4-5-315(a)). If, however, the agency reviews an initial order, the agency is required to prepare and file its own final order. *See id*. (citing Tenn. Code Ann. §§ 4-5-314(a), -315(g)).

Because the agency has superior authority to that of the ALJ, the agency's decision-making authority is not circumscribed by the ALJ's initial order. *Id*. at 822. Further and significant to the present issue, because the agency possesses its own fact-finding authority, "**it may make its own factual determinations, and it may substitute its judgment for that of the [ALJ**.]" *Id*. (citations omitted) (emphasis added). Nevertheless, when an agency reviews an initial order, the "**agency should not ignore

---

[1] It is undisputed that the UAPA's judicial-review provision, Tenn. Code Ann. § 4-5-322, applies to our review of the Board's decisions. *See* NES Rule § 7.093 ("Appeals are governed by Tenn. Code Ann. 27-9-114 and TCA 4-5-322, and Appendix III, Article 43, Section 11 of the Metropolitan Charter"); *Mitchell v. Elec. Employees' Civil Serv. & Pension Bd. of Metro. Gov't of Nashville & Davidson Cty.*, No. M2018-00186-COA-R3-CV, 2019 WL 211921, at *6 (Tenn. Ct. App. Jan. 16, 2019) (deciding the case in accordance with Tenn. Code Ann. §§ 27-9-114 and 4-5-322).

**the findings of fact and credibility determinations contained in an initial order**." *Id*. at 823 (emphasis added). The "agency must base its findings of fact exclusively on the evidence introduced during the contested case hearing or on matters that have been officially noticed." *Id*. at 822 (citing Tenn. Code Ann. § 4-5-314(d)). Further and significantly, the "**agency's final order must also identify any differences between its findings of fact and conclusions of law and those in the initial order**." *Id*. (citing Tenn. Code Ann. § 4-5-315(i)) (emphasis added).

## B. NES Disciplinary Proceedings

When Nashville and Davidson County formed a metropolitan government, the legislation that created NES was incorporated as Appendix III of the Metro Charter. *Metro. Elec. Power Bd. v. Metro. Gov't of Nashville & Davidson Cty.*, 309 S.W.3d 474, 476 (Tenn. Ct. App. 2008).[2] Article 43 of Appendix III "creates a civil service system exclusively for NES employees." *Id*. at 477. Although this system "gives the Board the authority to promulgate rules relating to NES employees, including rules regarding discharge, compensation, and promotion," *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 647 (Tenn. Ct. App. 2001), the Board's authority is "bound by the terms and limitations contained in the Metro Charter," *Kiger v. Nixon*, No. 01A01-9511-CH-00501, 1996 WL 512031, at *6 (Tenn. Ct. App. Sept. 11, 1996); *see Moore*, 72 S.W.3d at 647 ("NES is governed entirely by the Nashville and Davidson County Charter.").

The terms and limitations contained in Article 43 include a basic procedure for the discipline of NES employees that requires the Board to reduce its findings to writing:

10. Charges against any employee of the electric power board of the metropolitan government may be preferred by any person except a member of said board. Upon charges being preferred against any employee, such employee in the discretion of the general manager, may thereupon be suspended, pending disposition thereof.

 Charges against employees of said electric power board shall be filed or brought exclusively before the electric employees' civil service and pension board. Any charges filed against any employee shall be in writing, and shall be filed in such form and manner as the board may by its rules from time to time prescribe. . . .

---

[2] NES was created by private act in 1947. *Metro. Elec. Power Bd.*, 309 S.W.3d at 476.

.    .    .

11.     Upon any charge against any employee being filed with said board, **it shall, according to its own rules, determine the merits thereof and reduce its findings to writing**, and may either suspend, dismiss, or otherwise punish the employee against whom such charge is made. . . .

Metro Charter, App'x III, Art. 43, §§ 10–11 (current through Nov. 27, 2019), *available at* https://library.municode.com/tn/metro_government_of_nashville_and_davidson_county/codes/charter?nodeId=THCH_APCH_AR43.

In exercising its authority under the Metro Charter, the Board promulgated the *Rules for Employees of Nashville Electric Service* ("NES Rules"), including its own rules for determining the merits of charges against employees. Under § 7.08 of the NES Rules, the Board may refer charges "to an Administrative Law Judge designated by the Board for hearing." After the hearing's conclusion, the ALJ must "prepare and file with the Secretary of the Board a Report and recommend findings and conclusions." *Id*. § 7.083. The Board must then "decide the case, based on the Record and the Administrative Law Judge's Report." *Id*. § 7.084. "The Board may adopt, modify, or reverse, in whole or in part, the recommendations in the Administrative Law Judge's Report, or may remand the matter for the taking of such additional evidence and reporting thereon, as the Board deems necessary." *Id*. § 7.084.

Thus, like agencies operating under the UAPA's contested case procedures, the Board must render a written final decision.[3] Under either procedural framework, this requirement may be satisfied by the ALJ's "initial order." Unlike an initial order under the UAPA, however, an ALJ's report and recommendation in NES disciplinary proceedings cannot become the Board's final order by operation of law without being reviewed by the Board. Also, unlike the UAPA, the NES Rules neither require the Board to render a final order nor identify "any difference between such order and the initial order." Thus, a Board may modify or reverse an ALJ's recommendation without rendering its own final order. For purposes of judicial review, however, we must presume the Board approved of the ALJ's findings absent a written order to the contrary. This is because the NES Rules and Tenn. Code Ann. § 27-9-114 require us to apply the UAPA's

---

[3] If the Board does not refer the matter to an ALJ, the Board must make its own formal findings and conclusions. *See id.* § 7.082 ("The Board's formal findings and conclusions shall, when approved by it, become a part of the Record in the case.").

standard for judicial review when considering Board disciplinary decisions. *See* Tenn. Code Ann. § 27-9-114(b)(1); NES Rules § 7.093.

## C. UAPA's Standard of Judicial Review

Under the UAPA's standard for judicial review, reviewing courts must consider whether the application of the controlling legal principles to the agency's findings would lead a rational person to reach the same conclusion as the agency. *See McEwen*, 173 S.W.3d at 820. "Without findings of fact a reviewing court is unable to determine whether the decision reached by an administrative agency follows as a matter of law from the facts stated as its basis, and whether the facts so found have any substantial support in the evidence." *Levy v. State Bd. of Examiners for Speech Pathology & Audiology*, 553 S.W.2d 909, 912 (Tenn. 1977) (quoting *USV Pharm. Corp. v. Sec'y of Health, Ed. & Welfare*, 466 F.2d 455, 462 (D.C. Cir. 1972)). Accordingly, the requirement that an agency make findings of fact "is not a mere technicality but is an absolute necessity without which judicial review would be impossible." *CF Indus. v. Tennessee Pub. Serv. Comm'n*, 599 S.W.2d 536, 541 (Tenn. 1980) (quoting *Levy*, 553 S.W.2d at 911).

When the agency renders its own decision, "it is the agency's final order, not the initial order that is the subject of judicial review." *McEwen*, 173 S.W.3d at 822. However, the initial order is not rendered insignificant. To the contrary, the initial order remains "a relevant and important part of the administrative record." *Id*. at 824. In particular, the initial order is significant to the judicial review process for determining whether there was sufficient evidentiary support for the agency's decision:

> While a reviewing court must focus its attention on the agency's final order, it may consider the initial order when determining whether the agency's final order has sufficient evidentiary support. *See* 3 Admin. Law & Prac. § 11.10[3](a), (b), at 73. If the record contains evidence sufficient to support the conflicting findings of the agency and the hearing officer or the administrative judge, the agency's findings must be allowed to stand even though the court might have reached a different conclusion on its own. *Kopack v. NLRB*, 668 F.2d 946, 952 (7th Cir.1982); *Dep't of Health & Mental Hygiene v. Shrieves*, 641 A.2d at 908.

*Id.* at 824.

As established by the foregoing, the Board was required to make findings of fact, *see* Metro Charter, App'x III, Art. 43, § 11, which requirement affords the reviewing court the means to determine whether the Board's decision "follows as a matter of law from the facts stated as its basis, and whether the facts so found have any substantial support in the evidence." *Levy*, 553 S.W.2d at 912. In the case at bar, the Board did not reject or modify the ALJ's findings and did not make any findings of fact that conflict

with the ALJ's findings of fact. Instead, following a brief discussion in which two Board members expressed their individual reasoning, the Board voted to reject the ALJ's recommendation—but not his findings of fact—and uphold the recommendation of NES management without attempting to reach a consensus on its reasoning.

Because the only findings of fact in the record are those set forth by the ALJ, we shall determine whether the record contains substantial and material evidence that supports the facts so found and whether the Board's decision follows, as a matter of law, from the required factual findings. *See McEwen*, 173 S.W.3d at 820.

## II.    THE FINDINGS OF FACT IN THE ADMINISTRATIVE RECORD

The first inquiry in this contested case appeal is whether the ALJ's conclusion that NES failed to establish that Mr. Mansell knowingly approved false timesheets submitted by a police officer before June 12, 2015, was supported by substantial and material evidence.[4] In November 2017, the ALJ issued his Report, which contained numerous and specific findings of fact based on the witness testimony and documentary evidence presented at the administrative hearing.

### A. Credibility Determination Regarding Key Witness

To begin with, the trial court found no direct evidence that Mr. Mansell knowingly accepted or submitted falsified timesheets on Officer Moultry's behalf. Although NES asserted Mr. Mansell's crewmate, Hayes Baker, witnessed the exchange of falsified timesheets, the ALJ found that Mr. Baker was not a credible witness:

[4] Mr. Mansell was disciplined in August 2015 for approving Officer Moultry's timesheets for June 12, 18, and 19, 2015, and, significantly, Mr. Mansell has not been accused of approving any false timesheets submitted by any officer since June 2015. While Mr. Mansell's knowing approval of the June 12, 18, and 19, 2015 timesheets would be relevant in fashioning his discipline, it is neither relevant nor material in determining whether NES established that Mr. Mansell knowingly approved any false timesheets prior to June 12, 2015. Former C&M Operations Manager, Ty Jones, also testified that Mr. Mansell's prior discipline for similar acts was a factor to be considered in determining the appropriate punishment for *additional* misconduct. We also acknowledge the Board's contention the ALJ and the trial court erred by applying the doctrine of industrial jeopardy, which prevents the punishment of an employee twice for the same misconduct. We find it unnecessary to address this issue because neither the ALJ nor the trial court applied the doctrine in the manner the Board argues. Moreover, NES did not base the present charges against Mr. Mansell on the June 12, 18, and 19 timesheets. As the ALJ noted, "Timesheets for June 12, 18, 19, 2015, the dates that Mr. Mansell admitted [to] submitting false timesheets, are not included in [the evidence], and were not presented at the Final Hearing."

86. NES called Mr. Hayes Baker on rebuttal. Hayes Baker was the C&M crew member who was on Mr. Mansell's team and is who reported the complaint to Ty Jones at NES that prompted NES to commence action about the FlagPros' officers' timesheets. . . .

87. On cross-examination, Mr. Baker asserted that there were a number of occasions when Mr. Moultry would turn in a timesheet to Mr. Mansell and leave. Mr. Baker then claimed that there might have been thirty (30) such occasions. . . .

88. This proof was contradicted by the testimony of Chuck Reinitz, NES supervisor. Mr. Reinitz doubted whether there were ever substantial lengths of time in which FlagPros' officers were simply not present to work the NES C&M crew to which he was assigned.

89. Another supervisor confirmed that it was very unusual for a downtown network crew to function without a FlagPros officer present for any substantial amount of time. . ..

90. Mr. Baker's testimony was very difficult to believe. His testimony was rambling and difficult to follow at times. The gist of his testimony (and apparently his biggest gripe about the Moultry affair) was that Mr. Moultry would appear at work, turn in his timesheet, and leave. While this would be consistent with the records on some of the dates in question . . . it is hardly consistent with the testimony of the two undisciplined NES supervisors who both attested that almost never could a crew get away with not having a FlagPros' officer present for all or nearly all of an entire workday. Mr. Baker testified that this happened in the range of thirty (30) times.

Significantly, the Board did not address the ALJ's finding that Mr. Baker was not a credible witness when it rejected the ALJ's recommendation to deny the charges for termination.

"When [an] agency conducts a hearing and can evaluate the witnesses as they testify, this Court gives the tribunal's credibility determinations great weight." *City of Memphis v. Civil Serv. Comm'n*, 239 S.W.3d 202, 208 (Tenn. Ct. App. 2007) (citing *Pruitt v. City of Memphis*, No. W2004-01771-COA-R3-CV, 2005 WL 2043542, at *7 (Tenn. Ct. App. Aug. 24, 2005)). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary."

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We find no basis to re-evaluate the ALJ's assessment of Mr. Hayes's credibility.

### B. Responsibility for Verifying Timesheets

Moreover, the ALJ found the evidence was insufficient to establish that Mr. Mansell was responsible for verifying the hours on Officer Moultry's timesheets. This is significant because, as the ALJ noted, the fundamental premise of NES's charges against Mr. Mansell was the assertion that Mr. Mansell, as the crew foreman, had an affirmative duty to verify the officers' timesheets before approving them. After reviewing the record, we have determined that the evidence supports the ALJ's finding.

It was undisputed that NES provided the timesheets for each police officer to complete, sign, and turn in to the crew foreman at the end of the officer's shift. Manifestly, by completing the form, the police officer was affirmatively representing that the officer worked the hours he or she claimed to have worked at an NES jobsite on that day. In Officer Moultry's case, the ALJ found that Officer Moultry would complete and leave the timesheet in Mr. Mansell's truck before leaving the jobsite.

It was also undisputed that the crew foreman would sign the officer's timesheet at a line entitled "NES Supervisor Signature," and then submit it to a supervisor who would initial the timesheet. Significantly, the ALJ found that the only other instruction that Mr. Mansell was given was to add a work-order number, and no explanation was given to Mr. Mansell as to the import of his signature. The ALJ also found it material that Supervisor Reinitz initialed 90% of the timesheets that Mr. Mansell signed for Officer Moultry and independently signed another 15 timesheets that Mr. Mansell did not sign.

Moreover, the letter preferring charges against Mr. Mansell stated that the crew foreman *and* the supervisor had a responsibility to verify the accuracy of the officers' timesheets. The letter stated, in pertinent part, "[T]he NES supervisor or working foreman overseeing the worksite is responsible for verifying the [FlagPros'] officers' timesheets to ensure that the officer provided the traffic control services for the NES worksite." At first, former C&M operations manager, Ty Jones, confirmed this fact in his testimony at the final hearing. However, Mr. Jones later changed his testimony by stating that the supervisor had no responsibility for verifying the timesheets. Mr. Jones explained that Mr. Mansell's signature represented an "approval," whereas the supervisor's initials had no significance other than to "acknowledge" that it was received.

Finally, Mr. Mansell's job description did not include overseeing the work of contractors, who operated alongside NES employees at the jobsite, or verifying the

contractors' payroll reports. Mr. Mansell's job description as an NES "Cable Splicer Working Foreman" stated that his primary duties were to oversee and coordinate "the work of employees to accomplish assigned tasks," provide "input in the evaluation of employees and train employees as required," and oversee "the work of *others* in accomplishing these tasks." The ALJ found that NES defined "others" as NES employees and it was undisputed that the police officers were not NES employees. Thus, Officer Moultry was not someone Mr. Mansell was to oversee.

Based on our review of the record, we find the evidence supports the ALJ's determination that Mr. Mansell was not responsible for verifying the information on the officers' timesheets.

## C. End of Shift Discrepancies

Even if Mr. Mansell was responsible for verifying the timesheets, the ALJ found that the majority of Officer Moultry's timesheets were not materially inaccurate because the timesheets conformed with an unwritten practice of accepting timesheets for a full day of work, even when the NES crew left the jobsite early:

66. There was some testimony during his cross-examination that Mr. Moultry may have left early from time to time, but according to Mr. Mansell, paying the FlagPros officer through 2:30 even if the team broke from the jobsite early was well accepted practice.

67. Mr. Reinitz, the supervisor, testified that the FlagPros officers came and left at the same time every day. TR. Vol. 1, 253:10-13 ("Q. Mr. Reinitz, did the officers have a set schedule, pretty much come and leave at the same time every day? A. Yes."). Further, Mr. Reinitz knew that by sometime in 2014 Mr. Moultry had become a lieutenant and had to clock in at MNPD at 2:00 p.m. Nevertheless, Mr. Reinitz initialed over 90% of the timesheets for which NES asserts Mr. Mansell should be terminated for approving, and signed another fifteen (15) timesheets—fourteen of which have either the same identical 30 minute (.50 hour) discrepancy or worse. 15 NES Exs. 4 & 5.

74. NES offered no specific proof that it was a practice that was unacceptable to NES for the FlagPros officers to be paid for the 2:00 to 2:30 time period even if they were not in the street working with the crews. No supervisor testified that they made it clear to the working foremen that the end time on the timesheets had to correspond to the time that the FlagPros officer left the worksite.

- 15 -

Further, no supervisor testified that they made it their practice to be at a C&M jobsite from time to time to see when the crews broke and the FlagPros officers left to see if the timesheets were being submitted properly. Instead, the supervisor simply initialed and signed timesheets routinely that had the FlagPros officers working through 2:30 despite the fact that he knew that Mr. Moultry had been promoted to lieutenant at MNPD and that his shift started there at 2:00 p.m.

.   .   .   .

78.     Although NES has not disregarded the .5 increments in its arguments in this case in which it seeks Mr. Mansell's termination, the proof regarding the acceptability of the .5 increments in the contemporaneous records, signed by an NES supervisor, as well as Mr. Jones' "agreement" at the Due Process hearing regarding the marginal relevance of those discrepancies, and the other proof in this case, indicate that the numerous .5 increment overlaps between Mr. Moultry's FlagPros' timesheet and his attendance record at MNPD was not a material discrepancy and most likely was an accepted practice at the time.

Based on this evidence, the ALJ found that Mr. Mansell was acting in accordance with C&M's usual practices:

Mr. Mansell testified that normally, the crew was finished at the worksite by 2:00 each day. While this does not explain why he approved timesheets that paid for time through 2:30, it demonstrates that he thought it was an acceptable practice to approve such time. See TR. Vol. p. 390:4–25. Further, and significantly, if the crew left the street at 1:50 or so, the working foreman considered the FlagPros officer to be on standby for the remainder of the normal work shift. TR. Vol. 1, p. p. 391:20-22.

The evidence supports the ALJ's finding that acceptance of timesheets for a full day of work was a common and permissible practice even when the crew left the jobsite early. This finding is bolstered by the fact that all but five of the 200 plus timesheets showed the reporting officer as working a full shift, either from 7:30 a.m.

- 16 -

to 1:30 p.m. or 8:30 a.m. to 2:30 p.m.,[5] and at no time prior to June 2015 had anyone in the NES hierarchy questioned the accuracy of the timesheets.

In *City of Memphis v. Civil Service Commission*, this court explained the standard of review outlined in Tenn. Code Ann. § 4-5-322 as it pertains to the factual findings as follows:

> Upon confirming that an agency has employed the proper legal principles in the case under review, this Court must then consider the disputed factual findings and address whether the agency had a reasonably sound basis for making those findings. Like the trial court, this Court applies the substantial and material evidence standard in reviewing the agency's findings of fact. Substantial and material evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis for the decision under consideration."

> As directed by the statute, we take into account whatever in the record fairly detracts from the weight of the evidence, but we may not substitute our own judgment on questions of fact by re-weighing the evidence. When the agency conducts a hearing and can evaluate the witnesses as they testify, this Court gives the tribunal's credibility determinations great weight.

*City of Memphis*, 239 S.W.3d at 207–08 (internal citations omitted).

Having considered the disputed facts and credibility determinations, which are both substantial and material, we conclude that the administrative record contains relevant evidence that provides a sound basis for the ALJ's findings of fact. *See id.*

### III.   THE BOARD'S CONCLUSION

Based on the above and numerous other findings, the ALJ recommended the charges of termination be denied and, instead, that Mr. Mansell be reinstated without back pay. Nevertheless, without making findings of fact that differed with those of the ALJ which are supported by substantial and material evidence, the Board rejected the

---

[5] During 2014, officer shifts went from 8:30 a.m. to 2:30 p.m. In January 2015, the shift changed to 7:30 a.m. to 1:30 p.m.

ALJ's recommendation and voted to uphold the decision of NES management to terminate Mr. Mansell. Thus, we know the Board disagreed with the ALJ's recommended discipline; however, we do not know the specific facts upon which the Board based its decision to terminate Mr. Mansell.

As noted earlier, we may modify or reverse an administrative decision if it is "[a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tenn. Code Ann. § 4-5-322(h)(4). "Agency decisions not supported by substantial and material evidence are arbitrary and capricious." *Jackson Mobilphone Co., Inc. v. Tennessee Pub. Serv. Comm'n*, 876 S.W.2d 106, 110 (Tenn. Ct. App. 1993) (citations omitted). A decision is also arbitrary and capricious if it "is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *City of Memphis v. Civil Serv. Comm'n of City of Memphis*, 216 S.W.3d 311, 316 (Tenn. 2007) (quoting *Jackson Mobilphone Co., Inc.*, 876 S.W.2d at 110–11). Moreover, we may reject an administrative agency's determination if a reasonable person would necessarily arrive at a different conclusion based on the evidence. *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001).

When the contested case was assigned to the ALJ, it became his responsibility to determine whether NES had shown, by a preponderance of the evidence, a reasonable basis for NES's recommendation to terminate the employment of Mr. Mansell. *See* NES Rules § 7.083; *Tennessee Dep't of Correction v. Pressley*, 528 S.W.3d 506, 522 (Tenn. 2017) (recognizing that the party who initiates contested case proceedings generally is assigned the burden of proving that the allegations are true by a preponderance of the evidence). The record contains substantial and material evidence that fully supports the ALJ's findings of fact, his conclusions of law, and his recommendation to reinstate Mr. Mansell without back pay rather than terminate his employment. Thus, had the Board adopted the ALJ's recommendation and a petition for judicial review had been filed, it would have been incumbent on the reviewing court to affirm the decision of the ALJ. However, it is not the ALJ's conclusion that we are reviewing.

Once management appealed the ALJ's decision, the Board had the responsibility to determine whether NES management had shown, by a preponderance of the evidence, a reasonable basis for its recommendation to terminate the employment of Mr. Mansell. *See id.* As noted earlier, because the Board disagreed with the ALJ, the Board's decision is subject to closer judicial scrutiny. *See McEwen*, 173 S.W.3d at 823. In such cases, we will not abandon the substantial and material evidence standard of review, but we may view the evidence supporting the agency's findings of fact as less substantial than it would have been had the agency and the administrative judge reached the same conclusion, particularly, as is the case here, when it concerns credibility determinations. *Id.*

- 18 -

Although the Board was entitled to make its own decision, the Board should not have ignored the ALJ's findings of fact and credibility determinations. *See id*. As we have repeatedly stated in this opinion, the Board did not make its own findings of fact. *See* NES Rule 7.085. The only decision in its final order was to reject the recommended discipline and uphold the recommendation of NES management.

Significantly, the Board did not discuss and apparently did not consider the ALJ's findings of fact, including the following three findings that are both substantial and material:

65. **Mr. Mansell** testified that he acknowledged the three (3) days upon which he made wrongful approvals of Mr. Moultry's time that he admitted to in [June] 2015 and for which he was disciplined on August 24, 2015 (five-day suspension without pay), but he generally **denied that the other timesheets were false**.

64. Mr. Moultry did not testify in this case. Although NES presented the summary by MNPD showing when Mr. Moultry was paid for working at MNPD (NES Ex. 3), **there was little or no proof that Mr. Moultry was not present and working for FlagPros on the days and at the times shown on the FlagPros' timesheets in Exhibit 7**.

85. **No specific proof was presented at the Final Hearing, however, that Mr. Mansell knew he had received false timesheets for these six dates or for any date other than the three dates in June 2015 for which he confessed his misconduct and for which he had already been punished**.

(Emphasis added).

Although Board member Clinton Gray noted that Mr. Mansell "admittedly lied about something," neither he nor the Board identified any fact in the record to support this belief—other than Mr. Mansell's admission that he approved false timesheets for June 12, 18, and 19, 2015, for which he had already been disciplined. Further, although Ms. Schott made the motion to reject the ALJ's recommendation at the April Board meeting and stated that "[w]e have had a lot of questions and discussions about culture," and that no organization "wants a discussion about culture and integrity and honesty to be occurring with respect to that organization," she too failed to identify any specific fact to support a finding that Mr. Mansell had engaged in conduct during the relevant period that adversely affected the culture, integrity, or honesty of NES and would justify termination of his employment.

Indeed, the Board members were justified in seeking to protect and preserve a culture of integrity and honesty among its employees. Nevertheless, even a bona fide concern that a bad culture existed is no justification to terminate a scapegoat, that is, to punish an employee for alleged but unproven conduct that not only was widely believed to be correct but also condoned by his supervisor.

The ALJ found (1) there was no direct evidence to refute Mr. Mansell's testimony that he did not know the timesheets were inaccurate; (2) crew foremen were never given responsibility to verify the timesheets' accuracy; and (3) it was a well-accepted practice among crew foremen *and* their supervisors to accept timesheets for a full days' work, even if the crew left the jobsite early. Considering these significant findings of fact, with which the Board did not differ, as well as numerous other findings of fact by the ALJ that are supported by substantial and material evidence in the record, we conclude that the Board's decision disregards the facts of this case and is not supported by substantial or material evidence. *See City of Memphis*, 238 S.W.3d at 243 (citing *City of Memphis*, 216 S.W.3d at 315). Moreover, the Board failed to identify a basis for its decision that would lead a reasonable person to reach the same conclusion. Therefore, the Board's decision to reject the recommendation of the ALJ and to terminate Mr. Mansell's employment was arbitrary and capricious. *See id.* (citing *City of Memphis*, 216 S.W.3d at 315).

Accordingly, we affirm the trial court's decision to reverse the decision of the Board and order the reinstatement of Mr. Mansell's employment without back pay.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the Board.

_____
FRANK G. CLEMENT JR., P.J., M.S.